2023 IL App (1st) 200093-U

THIRD DIVISION
May 10, 2023

No. 1-20-0093

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 13757 |
| | ) | |
| ANTON CARTER, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE D. B. WALKER delivered the judgment of the court.
Justices Reyes and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction and sentence where the trial court's rulings did not deprive defendant of his right to present a complete defense, he was not prejudiced by an improper prosecutor comment, and the trial court properly found that under the facts of this case, criminal trespass to a vehicle was not a lesser-included offense of aggravated vehicular hijacking.

¶ 2    Defendant Anton Carter appeals his conviction after a jury trial for aggravated vehicular hijacking with a firearm and armed robbery. On appeal, defendant alleges that the following errors

deprived him of a fair trial: (1) the trial court refused to continue the case so the detective who assembled the first photograph array could testify at trial, (2) the trial court precluded defense counsel from arguing adverse inference during closing argument and denied his request to tender an adverse inference instruction to the jury regarding missing evidence, (3) the prosecutor improperly appealed to the jury's emotions and falsely asserted that the defense chose not to subpoena a key witness, and (4) the trial court refused to instruct the jury on the lesser-included offense of criminal trespass to a vehicle. For the following reasons, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4       The State charged defendant with one count of aggravated vehicular hijacking and one count of armed robbery stemming from a carjacking that occurred on July 22, 2010.

¶ 5       On December 4, 2014, defendant filed a motion to dismiss the indictment. According to a case supplementary report by Chicago Police Detective Victor Law, the carjacking victim Sharon Bins " 'viewed mugshots [of] male black subjects arrested on Beat 413 and she stated that the subject who carjacked her was possibly Darrius Wroten IR #1671186 but she was uncertain.' " After filing a motion on March 19, 2014 to produce the photographs, defendant discovered that they were not preserved. Defendant requested dismissal as a sanction in order to eliminate the prejudice caused by the State's failure to preserve exculpatory evidence.

¶ 6       At a hearing on January 12, 2015, the State offered to provide the defense with photographs of the person Bins tentatively identified. The State also argued that defense counsel could cross-examine Bins about her identification.

¶ 7       The trial court questioned whether the evidence was exculpatory. It found unavailing defendant's argument that Detective Law would provide material information on the circumstances of Bins' identification of Wroten. Rather, defendant's argument as to what the

detective would say was "speculation on [defendant's] part." The court noted that defense counsel could argue that Bins selected the photograph of a person who was not defendant and that the State failed to preserve the photographs she had viewed. The trial court denied defendant's motion, finding his request to dismiss the indictment "drastic."

¶ 8     Defense counsel then informed the court that the parties agreed to a trial date of March 9, 2015. When the court asked how many witnesses would be testifying, the State answered, "approximately six." Defense counsel noted that "we are probably looking at three days, four days." The court stated that the matter was set "[b]y agreement for trial 3-9."

¶ 9     On March 9, 2015, the State indicated that it was ready for trial. Defense counsel, however, answered that he was not ready. Counsel explained that the defense sent a subpoena to Detective Law at the police department, but he had retired and did not answer the subpoena. Counsel wanted to establish through Detective Law's testimony that his failure to preserve the mugshots was against department policy and affected the overall quality of the investigation. Detective Law's testimony could also clarify Bins' degree of certainty when identifying Wroten as the possible offender. Defense counsel requested a continuance to secure Detective Law's appearance as a witness.

¶ 10    The State offered to stipulate to "any impeachment" regarding Bins' prior identification of Wroten, but it refused to stipulate that Detective Law was subject to disciplinary action for violating police department policy. The State did not know Detective Law's current location.

¶ 11    Referring to section 114-4 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-4 (West 2014)), the trial court noted that a continuance may be granted if a material witness is unavailable. The court considered whether Detective Law was "material or not, unavailable, and if the Defense would be prejudiced" by the absence of his testimony. The trial court denied the

motion, reasoning that it would not "delay a case four and a half years old if the State is willing to stipulate to what [Detective Law] would say."

¶ 12    Before jury selection, defense counsel filed a motion to instruct the jury that it could infer from the missing photographs that the evidence was favorable to the defendant. The trial court delayed ruling on the motion until after presentation of the evidence when the issue would be "more relevant to the case." The court suggested that the parties not mention the missing photographs in their opening statements.

¶ 13    Defense counsel also asked the court to rule on his proposed stipulation regarding Detective Law's testimony. When the State objected to portions of the stipulation, counsel agreed to suggested amendments. He did not agree, however, to remove statements that Detective Law's failure to inventory the photographs violated the law. He argued it was relevant to show a "deviation from the standard of care" that affected the quality of the investigation. The trial court asked if this issue would arise during opening statements and defense counsel answered, "No." The court instructed counsel to "[c]hange those parts we talked about changing," and indicated it would rule on the disputed paragraph "a little later on." Counsel was again asked whether the issue of the missing photographs would arise during opening statements, and he answered, "No."

¶ 14    In her opening statement, the prosecutor told the jury that on July 22, 2010, "Ms. Bins became something other than a wife and a mother and a postal worker. She became a victim." The trial court overruled defense counsel's objection. The State later remarked that defendant "chose to arm himself, he chose Sharon Bins as his victim, and he decided what to take."

¶ 15    Defense counsel commented in his opening statement that on July 22nd, the day of the carjacking, Bins described her attacker as a light-skinned African American male who weighed 130 pounds and was five-feet three-inches tall. In contrast, defendant had a dark complexion and

was five-feet nine-inches tall. Counsel informed the jury that two days later, Bins' vehicle was also "involved in a chase and a car accident." The relevant issue, however, was who robbed Bins on July 22, 2010, not who was in the vehicle two days later when it crashed. Counsel asked the jury to keep in mind that Bins' description did not match with defendant.

¶ 16    At trial, Bins testified that on July 22, 2010, she drove her white Hyundai Azera to Jackson Park Hospital to visit a relative. After her visit, around 1:30 p.m., she walked to her vehicle in the parking lot. Bins had a cast on her leg and was alone. As she walked, she spoke with her husband Tommy via the Bluetooth in her ear.

¶ 17    Bins noticed a black male walking towards her wearing blue jeans, a white t-shirt, a cap and a jacket. It was a clear, sunny day so she could see his face. Defendant had a silver revolver in his hand and demanded Bins' keys and money. Bins was face-to-face with defendant and his firearm touched her stomach. She knew the firearm was a real weapon as she had experience with firearms. Bins identified defendant in court as the perpetrator.

¶ 18    Bins told her husband that she was being carjacked. Defendant then snatched the phone from Bins and put it in his pocket. Defendant said he needed the vehicle to take his sister to the hospital. Bins told him that she had no money, but she gave him the keys to the Hyundai. Bins asked defendant for her house keys, which he gave to her. He then drove away in her Hyundai.

¶ 19    Bins returned to the hospital and called 911. She spoke with Officer Betty Jordan, giving her a description of the offender and providing the license plate number of her vehicle. Bins never gave defendant permission to take the Hyundai.

¶ 20    On July 24, 2010, Bins was at home with Tommy when he received a call from his friend Shane Kizer. Kizer had spotted Bins' Hyundai in the area of 72nd Street and Stony Island in Chicago, and he was following it. After Bins called the police, she and Tommy drove to the area.

They did not see her vehicle, but they saw Kizer and the police. After speaking with them, Bins and Tommy drove south where they saw her vehicle near Stony Island and 95th Street. Bins could not see the driver's face. When the driver realized he was being followed, he turned onto 95th Street and drove west going 50 to 60 miles an hour. He did not stop at red lights or stop signs.

¶ 21    Bins and Tommy lost sight of the vehicle. After speaking with Kizer, they drove to 93rd and University Avenue where they saw that the Hyundai had crashed through an iron fence into a lot. Bins did not see anyone in the vehicle. When police arrived, they recovered three cell phones and a red shirt from the vehicle. None of the items belonged to Bins.

¶ 22    Two weeks later, in August 2010, Detective Law showed Bins photographs at the police station. She did not remember how many photographs she viewed, but it was not more than 15. She and Tommy also submitted buccal swabs at the request of the police.

¶ 23    On December 17, 2010, Detective Law showed Bins six photographs at her home. She did not know whether she had viewed any of these photographs in August. From these photographs, Bins identified defendant as the offender. In July of 2011, Bins went to the police station where she identified defendant in a physical line-up.

¶ 24    On cross-examination, Bins testified that she never told Officer Jordan that defendant was five-feet three-inches tall or that he had a light brown complexion. Bins stated that she did not see defendant's photograph in the group of photographs she viewed in August. She did not remember identifying one of the photographs as the person who was possibly the offender.

¶ 25    On re-direct, Bins reiterated that she did not see defendant's photograph in the group she viewed in August 2010. The State then asked, "Had you seen the defendant's photograph in August of 2010, would you have identified him?" Bins answered, "Yes." Defense counsel objected and the trial court sustained the objection, instructing the jury to "[d]isregard the answer yes."

¶ 26     Tommy Bins testified that he was talking to Bins on the phone around 1:20 p.m. on July 22, 2010, when she said she was being carjacked. Tommy heard a male voice tell Bins to give him the keys and her phone. Tommy drove to Jackson Park Hospital where he found Bins, shaken and distraught, speaking with a female officer.

¶ 27     Two days later, when Tommy was at home with Bins, Kizer called asking about the Hyundai's license plate number. After confirming that he spotted Bins' vehicle, Kizer followed it. Tommy and Bins drove to the area of 72nd Street and Stony Island where Tommy observed the Hyundai. He tried to follow the vehicle, but it sped down the street, and he lost sight of it. The driver was a black male with a dark complexion, but Tommy did not get a good look at him. After speaking with Kizer, Tommy drove to 93rd and University where he saw that the Hyundai had crashed through an iron fence.

¶ 28     Kizer testified that he had learned of the carjacking and knew Bins drove a white Hyundai with a license plate starting with the letter "A." In July of 2010, as he was driving near 72nd Street and South Kimbark Avenue, Kizer observed what he believed to be Bins' vehicle. He called Tommy to confirm the Hyundai's license plate number and followed the vehicle. When Tommy arrived, he tried to block the Hyundai but the vehicle "took off." It sped through streets and alleys without stopping at red lights or stop signs. As Kizer neared 93rd and University, he heard a crash. When he arrived at the scene, he saw Bins' Hyundai had driven through a wrought iron gate into a lot. No one was in the vehicle. Tommy, Bins and the police arrived soon thereafter.

¶ 29     Evidence technician Steven Swain testified that he photographed the Hyundai and the surrounding area. He swabbed the steering wheel, gear shifter, driver's side door switches and the driver's side airbags for biological evidence. The evidence was inventoried and transported to the Illinois State Police Crime Lab (ISP Crime Lab). Evidence technician Glenn Manguerra testified

that he collected and inventoried buccal swabs from Bins and Tommy, and the swabs were transported to the ISP Crime Lab. Debra Klebacha from the biology and DNA section of the lab, received the swabs and prepared them for DNA analysis.

¶ 30    Lauren Schubert, an expert in DNA analysis, testified that in October 2010 she worked at the ISP Crime Lab. She conducted DNA analysis on the swabs collected in the case. The swabs collected from the airbag and interior front of the Hyundai contained a mixture of DNA, but each swab contained the same major male DNA profile. After excluding Tommy as a match, Schubert entered the DNA profile into a national database which revealed a match to defendant. Schubert requested a buccal swab from defendant to confirm her findings.

¶ 31    Mary Ember testified that she is an investigator with the Cook County State's Attorney's Office. She was assigned to obtain a buccal swab from defendant and met with him on February 27, 2014, but he refused to provide a sample. On March 25, 2014, with his attorney present, defendant submitted to the buccal swab.

¶ 32    Lynette Wilson, a forensic scientist at the ISP Crime Lab, received the buccal swab from defendant and compared his DNA profile with the DNA profile on swabs taken from the airbag and interior of the Hyundai. She identified a male profile on the swabs that matched defendant's DNA profile.

¶ 33    Wilson conducted a statistical analysis to determine how often this DNA profile would occur in a certain population. She determined that the swabs taken from the airbag "would be expected to occur in approximately 1 in 11 billion black, 1 in 130 billion white, or 1 in 290 billion Hispanic unrelated individuals." The DNA profile on the swabs taken from the interior of the Hyundai contained more DNA information, so the statistics revealed a stronger comparison with defendant's DNA profile. Wilson's analysis indicated that the profile "would be expected to occur

approximately in 1 in 340 trillion black, 1 in 28 quadrillion white, or 1 in 33 quadrillion Hispanic unrelated individuals."

¶ 34    Detective Danny Stover testified that in May 2011, he took over the case after Detective Law retired. He knew there was an active investigative alert for defendant. Detective Stover and his partner located defendant on July 6, 2011, placed him into custody, and transported him to the police station.

¶ 35    After advising defendant of his *Miranda* rights, Detective Stover asked defendant whether he robbed someone and later crashed her vehicle. Defendant stated that he recalled the incident. He told the detective that he:

> "saw a lady walking near a hospital, at which time he robbed her and took the car, and then a couple of days later he said the victim's family was chasing him, and then the police became involved in the chase, at which time, in his attempt to elude, to keep from being caught, he wrecked the car."

When Detective Stover told defendant that he was identified through DNA analysis, defendant said he was "a stick-up guy." Defendant's statement was not recorded. Bins identified defendant as the offender in a physical line-up around 7 p.m. that evening.

¶ 36    The State rested. Before defendant presented his case, the trial court ruled on the proposed stipulation stating that Detective Law's failure to preserve the photographs viewed by Bins in August was contrary to law and statute. The parties subsequently agreed to remove this disputed language. The stipulation published to the jury stated:

> "It is stipulated by and between the parties that if Detective Victor Law, Star No. 20560, was called as a witness in the above-[titled] matter he would testify as follows:

He was a detective employed by the Chicago Police Department assigned to Area 2 in 2010. He has since retired.

On July 23, 2010, he was assigned to the investigation of a vehicular hijacking reported by Sharon Bins as having occurred at 7521 South Cornell Avenue, Chicago, Illinois. As part of his investigation he interviewed Sharon Bins on July 24th, 2010. During the course of the interview with Ms. Bins, he showed her a photograph [*sic*] of black male subjects arrested on Beat 413. ***

Ms. Bins told him that the person who carjacked her was possibly Darius Wroten, one of the individuals in the photos that she was shown, but she was uncertain. He did not record the number or identities of the other individuals displayed to Ms. Bins. He did not inventory the photo of Mr. Wroten displayed to Ms. Bins. He did not inventory the other photos displayed to Ms. Bins as required. No record exists as to the number of photos shown to Ms. Bins nor as to the identity of any of the individuals displayed in the photos other than Darius Wroten. Defendant's Exhibit No. 1 is a photograph of Darius Wroten.

Detective Law is unavailable to testify and cannot tell you if Defendant's Exhibit No. 1 is the photograph of Darius Wroten that Ms. Bins viewed on July 24, 2010. Detective Law further cannot tell you if a photograph of [defendant] was or was not included in the photographs shown to Ms. Bins."

¶ 37    The defense called Officer Jordan as a witness. Officer Jordan spoke with Bins at Jackson Park Hospital on July 22, 2010, and obtained a description of the offender. Ms. Bins told her that the offender was young, around 17 to 22 years old. When Officer Jordan asked about his skin tone, Bins replied that he was "brown." The officer asked if he was "light brown, medium brown," and then wrote "light brown complexion" in her report. Officer Jordan acknowledged that her report

indicated the offender was five-feet three-inches tall and weighed 130 pounds, but she could not recall her "whole conversation" with Bins. She stated, "I go by what I have in my report and in my notes. I could have recomposed those numbers, I don't know."

¶ 38    On cross-examination, Officer Jordan testified that Bins was nervous and distraught at the hospital. She did not recall Bins telling her the height of her offender. Officer Jordan believed that her report indicating the offender's height contained "a typo error on my part." On redirect, Officer Jordan stated that she wrote the report within two hours of speaking with Bins.

¶ 39    After the defense rested, the trial court held a jury instruction conference. Defense counsel requested an instruction on the lesser-included offense of criminal trespass to a vehicle. She argued that the jurors could find that defendant was not the person who took the Hyundai from Bins on July 22, 2010, but he was driving the vehicle on July 24, 2010 when it crashed through the fence. The trial court refused to give the jury the instruction, finding that "in this situation criminal trespass to a vehicle is a separate offense all together, not a lesser included offense of aggravated vehicular hijacking ***."

¶ 40    Defense counsel also requested an instruction for missing evidence pursuant to *People v. Camp*, 352 Ill. App. 3d 257 (2004). The instruction would inform the jury that the missing August 2010 photographs required an inference that the evidence was favorable to defendant. The trial court did not find the instruction appropriate but stated it would instruct the jury in accordance with 725 ILCS 5/107A-2(j)(2) (West 2014), over the State's objection. Accordingly, the jury was instructed that it "may consider all the facts and circumstances, including the fact that the photos shown to Bins on August 5, 2010 were not inventoried in weighing the identification testimony of a witness."

¶ 41    In closing, the prosecutor emphasized the reliability of Bins' identification of defendant as the offender, which was supported by DNA evidence. The prosecutor told jurors that Bins did not see a photograph of defendant when she viewed photographs in August 2010, and that Bins did not identify anyone until December 2010, when she was shown an array containing defendant's photograph. Bins then identified defendant as the offender "without question."

¶ 42    Defense counsel, in closing argument, conceded that defendant crashed Bins' vehicle on July 24, 2010, but argued that Bins' description of the person who carjacked her did not match defendant. Counsel further argued that Bins had identified Wroten in the array she viewed in August 2010, but

> "Detective Law doesn't follow procedure. He doesn't maintain the photographs. He shows her some number of photographs. He picks them up and we have no idea where those photographs are. You don't know as you sit here, and you have received no evidence whether [defendant] was in those photographs. You have received no evidence as to whether this man was in those photographs, but there was a photograph of this man, Darius Wroten, in that group of photos. We do know that, and we do know that it doesn't look like [defendant.]"

Counsel continued, "We don't get to hear from Detective Law," and the State objected. The trial court sustained the objection. Counsel then stated, "We can't tell you why, but we know Detective Law doesn't follow procedure with regard to photo arrays. We know about the irregularities. We don't know where a finger was put. We don't know what subtle ques [*sic*] were given --. " The trial court again sustained the State's objection.

¶ 43    In rebuttal, the State remarked, "They told you that you didn't hear from Detective Law. They can subpoena anybody they want." Defense counsel objected. The trial court overruled the

objection, stating that counsel "stipulated to what he said." The State then remarked that "they chose not to." Defense counsel again objected, which the trial court overruled.

¶ 44    The jury found defendant guilty of aggravated vehicular hijacking and armed robbery. Defendant filed a motion for a new trial which the trial court denied. At the sentencing hearing, the trial court merged the counts and sentenced defendant to 35 years' imprisonment for aggravated vehicular hijacking. Defendant filed this appeal.

¶ 45                                    II. ANALYSIS

¶ 46    Defendant argues that our standard in reviewing whether trial errors violated his right to present a complete defense is *de novo*, citing *People v. Burns*, 209 Ill. 2d 551 (2004). Although *Burns* held that the "standard of review for determining whether an individual's constitutional rights have been violated is *de novo*," (*Id.* at 560), defendant's constitutional claim is based on allegedly erroneous evidentiary rulings. Generally, we will not reverse a trial court's evidentiary determinations "unless the trial court has abused [its] discretion." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). Therefore, we apply an abuse of discretion standard when reviewing trial court evidentiary rulings that are within its discretion to make. See *People v. Bakr*, 373 Ill. App. 3d 981, 986 (2007) (citing *Caffey* in holding that "evidentiary rulings, such as the one presented by this case, are within the sound discretion of the trial court and should not be reversed absent an abuse of discretion"). [Removed last sentence and citation to *Stapinski*.]

¶ 47    Defendant first contends that he was denied a fair trial when the court refused his request to continue the case, thus denying him the opportunity to secure Detective Law's presence at trial. Defendant argues that he needed Detective Law's live testimony to support his theory that Bins misidentified defendant as the offender.

¶ 48    A motion for a continuance may be granted when a material witness is unavailable, and the defense will be prejudiced by the absence of their testimony. 725 ILCS 5/114-4(b)(3) (West 2014). However, section 114-4(b)(3) is not a basis for a continuance "if the State will stipulate that the testimony of the witness would be as alleged." *Id.* Here, the State offered to stipulate to certain testimony based on Detective Law's report, and defense counsel drafted the stipulation. The parties negotiated changes and eventually agreed on the stipulation regarding Detective Law's testimony if he were to testify at trial. Although defendant now contends he was "forced" to "stipulate away some key facts and not even mention others," there is no evidence in the record that he objected to the stipulation. In fact, defense counsel published the stipulation to the jury. "By consenting to the admission of the stipulation at trial, defendant agreed to proceed in one direction and cannot now object to the admission of that stipulation for the first time on appeal." *People v. Hill*, 345 Ill. App. 3d 620, 633 (2003).

¶ 49    We find no reversible error by the trial court. In reviewing the court's denial of a continuance in order to secure the presence of a witness, we consider: "(1) whether defendant was diligent; (2) whether defendant has shown that the testimony was material and might have affected the jury's verdict; and (3) whether defendant was prejudiced." *People v. Ward*, 154 Ill. 2d 272, 307 (1992). We will reverse the trial court's determination only upon finding an abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Caffey*, 205 Ill.2d at 89.

¶ 50    Defendant does not address his diligence in locating Detective Law, other than sending a subpoena to him at the police department. Detective Stover testified that Detective Law retired in May 2011, almost four years before defendant's trial in March 2015. On January 12, 2015,

approximately two months before the trial date, the court asked the State how many witnesses it would call. At that time, defense counsel could have confirmed whether Detective Law would appear as a witness and possibly could have discovered his retirement. Instead, counsel told the court that he was prepared for trial in March. The day of trial was the first time defense counsel informed the State or the court that Detective Law did not answer the subpoena. When requesting a continuance, defendant must show that he was diligent in attempting to locate the witness. *People v. Thurmond*, 262 Ill. App. 3d 200, 205 (1994). He has not met his burden here.

¶ 51    Defendant argues, without reference to the relevant rules or analysis, that the State had a continuing duty to disclose that Detective Law had retired. Defendant cites *People v. Blackman*, 359 Ill. App. 3d 1013 (2005), but that case is distinguishable. In *Blackman*, this court found that pursuant to Supreme Court Rule 415(b), the State had a duty to disclose that a key witness who testified at trial moved to a new residence and the State paid for her relocation expenses. *Id.* at 1017-18. In this case, however, Detective Law did not testify at trial, nor was the State involved in his retirement or change of residence. The State also did not know his current location.

¶ 52    Likewise, defendant's reliance on *People v. Walker*, 232 Ill. 2d 113 (2009) is unpersuasive. In *Walker*, defense counsel sought a continuance because she had mistakenly marked the trial as set for the following week, and she was unprepared. *Id.* at 117. *Walker* did not involve a request for a continuance in order to locate a witness, the basis for defendant's motion here. In determining whether to grant a continuance to secure the presence of a witness, courts consider the factors set forth in *Ward*. See *People v. McClain*, 343 Ill. App. 3d 1122, 1130 (2003) (listing the *Ward* factors to consider when reviewing the trial court's denial of a request for a continuance sought to secure the presence of a witness).

¶ 53    As for the remaining *Ward* factors, defendant has not established that Detective Law would provide material testimony, or that he was prejudiced by its absence. Since the record does not disclose the substance of Detective Law's proposed testimony, "its evidentiary value is entirely speculative." *People v. Markiewicz*, 246 Ill. App. 3d 31, 47 (1993). With no showing that Detective Law's testimony would have been favorable to defendant, we cannot say that the results of the trial would have changed had he testified. See *People v. Glenn*, 363 Ill. App. 3d 170, 173 (2006).

¶ 54    Defendant argues that at trial Detective Law "would have to testify regarding the exculpatory identification and answer for his apparent misconduct in destroying the photos." Defense counsel then could "use his words, demeanor, and actions" in testifying to discredit Bins' subsequent identification of defendant. Defendant's argument, however, is based on speculation about how Detective Law might respond to questioning. We do not know whether Detective Law would have testified in the manner suggested by defendant. As such, defendant has not shown any real probability that the result of his trial would have been different with Detective Law's testimony. *Id.* at 174. The trial court's decision to deny defendant's request for a continuance was not an abuse of discretion.[1]

¶ 55    Defendant next contends that a number of trial errors precluded him from presenting a complete defense.

---

[1] Defendant also concludes in his brief that the State's failure to preserve the photographs shown to Bins in August 2010 violated his right to due process because they were "material, exculpatory, and essential to the defense." However, defendant raised this issue before the trial court in his motion to dismiss the indictment, and the court denied the motion. He does not challenge that determination on appeal. We need not consider this claim as points not argued are forfeited on appeal, and may not be raised in the reply brief, in oral argument, or on a petition for rehearing. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 56 First, defendant contends that during closing argument, the trial court improperly barred defense counsel from arguing adverse inference regarding the lost photographs. The trial court sustained the State's objection to defense counsel's argument that "We don't know what subtle ques [*sic*] were given --" by Detective Law when Bins made her identifications. Defendant argues that the argument was a fair one because the detective had not preserved the August 2010 photograph array. The trial court's ruling thus "precluded the defense from arguing that the jurors should draw adverse inferences against the State."

¶ 57 We disagree. In closing argument, defense counsel was allowed to argue:

"Detective Law doesn't follow procedure. He doesn't maintain the photographs. He shows her some number of photographs. He picks them up and we have no idea where those photographs are. You don't know as you sit here, and you have received no evidence whether [defendant] was in those photographs. You have received no evidence as to whether this man was in those photographs, but there was a photograph of this man, Darius Wroten, in that group of photos. We do know that, and we do know that it doesn't look like [defendant.]"

Defense counsel was not precluded from arguing adverse inference. To the contrary, the record shows that in closing argument defense counsel invited the jury to draw adverse inferences from the State's failure to preserve the photographs.

¶ 58 Defendant also argues that the trial court improperly denied his request to tender an adverse inference jury instruction regarding the missing photographs. "The function of instructions is to convey to the jurors the correct principles of law applicable to the facts so that they can arrive at a correct conclusion according to the law and the evidence." *People v. Fuller*, 205 Ill. 2d 308, 343

(2002). An Illinois Pattern Jury Instruction ("IPI") should be used whenever it accurately states the law. *People v. Danielly*, 274 Ill. App. 3d 358, 367 (1995).

¶ 59    No adverse inference IPI exists for criminal cases, however. See *People v. Blackwood*, 2019 IL App (3d) 160161, ¶ 21 (noting that while the Civil IPIs contain an adverse inference instruction for missing evidence, "there is no comparable missing evidence instruction in the criminal jury instructions"). A non-IPI instruction should be used only if it is simple, brief, impartial, and free from argument. *People v. Pollock*, 202 Ill. 2d 189, 212 (2002). As a general rule, there must be "some evidence" in the record to support giving a specific instruction. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). We will not reverse the trial court's refusal to issue a nonpattern jury instruction absent an abuse of discretion. *People v. Garcia*, 165 Ill. 2d 409, 432 (1995).

¶ 60    There is no abuse of discretion in refusing the adverse inference instruction if the trial court allowed the party requesting the instruction to argue the missing evidence issue to the jury. *Simmons v. Garces*, 198 Ill. 2d 541, 574 (2002). Here, defense counsel argued the missing photographs issue to the jury, implying that they should draw adverse inferences from the State's failure to preserve the evidence. As such, defendant was not prejudiced by the trial court's refusal to tender the adverse inference instruction. *Id.*

¶ 61    Furthermore, the trial court instructed the jury pursuant to section 107A-2 of the Code, over the State's objection. Section 107A-2(i) provides that "[a]ll photographs of suspected perpetrators shown to an eyewitness during a lineup shall be disclosed to counsel for the accused ***." 725 ILCS 5/107A-2(i) (West 2014). As a consequence of noncompliance with this provision, "[w]hen warranted by the evidence presented at trial, the jury shall be instructed that it may consider all the facts and circumstances including compliance or noncompliance with this Section to assist in its weighing of the identification testimony of an eyewitness." *Id.* 107A-2(j)(2).

¶ 62    Accordingly, the trial court instructed the jury that it "may consider all the facts and circumstances, including the fact that the photos shown to Bins on August 5, 2010 were not inventoried in weighing the identification testimony of a witness." This instruction, together with defense counsel's argument regarding the missing photographs, informed the jury that it could draw an adverse inference from the State's failure to preserve the photographs. We find no abuse of discretion in the trial court's refusal to tender defendant's adverse inference instruction. See *People v. Nutall*, 312 Ill. App. 3d 620, 633 (2000) (finding that the refusal to give a non-IPI instruction does not constitute an abuse of discretion if the essence of the refused instruction is covered by other jury instructions).

¶ 63    In summary, defendant presented his theory of the case, misidentification, in the opening statement and closing argument, and elicited evidence supporting his theory. Defense counsel highlighted the contradictions in Bins' description of the offender compared with defendant, and cross-examined Bins on her identifications. Counsel was also able to argue, based on the Detective Law stipulation, that the missing photographs were favorable to him. Although defendant argues that the trial court precluded him from informing the jury about the missing photographs in the opening statement, defense counsel twice confirmed that he would not raise the issue during opening statements. When a party acquiesces in proceeding in a given manner, he is not in a position to claim he was prejudiced by that course of action. *People v. Villareal*, 198 Ill. 2d 209, 227 (2001). We find that defendant was not deprived of his right to present a complete defense.

¶ 64    Defendant next contends that prosecutor comments during the State's opening statement and closing argument denied him a fair trial.

¶ 65    We view opening statements and closing arguments in their entirety, and the challenged remarks in their context. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Prosecutor comments

constitute reversible error only when defendant is substantially prejudiced such that the result of his trial would have been different absent the improper remark. *Caffey*, 205 Ill. 2d at 131. We apply an abuse of discretion standard in reviewing the trial court's ruling on the propriety of the challenged remarks, and a *de novo* standard in reviewing whether any misconduct was egregious enough to warrant a new trial. *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 61-62.

¶ 66   Opening statements allow a party to remark generally and concisely about the facts and issues of the case. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 22. However, comments intended "only to arouse the prejudice and passion of the jury are improper." *Id.* ¶ 21. Defendant contends that the prosecutor improperly referred to Bins as a "victim" in the opening statement, as that word "is loaded with meaning and emotion." Defendant cites two out-of-state cases in support: *State v. Albino*, 130 Conn. App. 745 (2011), and *Veteto v. State*, 8 S.W. 3d 805 (Tex. App. 2000).

¶ 67   In *Albino*, there was no dispute that a homicide occurred and that the defendant caused it to occur. The only issue at trial was whether the homicide was justified. *Albino*, 130 Conn. App. at 766. The court concluded that the prosecutor's use of the word "victim" 27 times, his reference to the killing as a "murder" 12 times, and calling the firearm used a "murder weapon" 6 times, improperly amounted to his opinion on the ultimate issue of the case. *Id.* In *Veteto*, the defendant disputed that he sexually assaulted A.L. *Veteto*, 8 S.W.3d at 809. The sole issue of the case was whether the defendant committed the assaults. *Id.* at 816. The court of appeals found that referring to A.L. as a "victim" was improper because it gave "credence to her testimony that the assaults occurred and that she was, indeed, a victim." *Id.*

¶ 68   Of course, this court is not bound by the findings of courts in other states. *People v. Sullivan*, 366 Ill. App. 3d 770, 781 (2006). Nonetheless, unlike *Albino* and *Veteto* where the issue at trial was whether a crime actually occurred, the parties here did not dispute that Bins was the

victim of a carjacking. Using "victim" to describe Bins did not boost the credibility of her testimony, nor was it an improper prosecutorial opinion on the deciding issue of the case. Furthermore, we find no substantial prejudice to defendant where the prosecutor used the word "victim" only twice during an opening statement that spanned seven pages of record.

¶ 69    Defendant also argues that it was improper for the prosecutor to question Bins on whether she would have identified defendant had she seen his photograph in August 2010. Bins answered, "Yes." The trial court immediately sustained defense counsel's objection and instructed the jury to disregard her answer. In so doing, the trial court cured any prejudice that may have resulted. See *People v. Sandifer*, 2016 IL App (1st) 133397, ¶ 64; *People v. Keene*, 169 Ill. 2d 1, 20 (1995). Additionally, the trial court instructed the jury that if the court sustained an objection to a question asked, they should not speculate about any answer the witness might give or "draw any inference from the question itself." We find no reversible error here.

¶ 70    Defendant argues that the prosecutor also made numerous comments during closing argument that either contradicted the facts in the stipulation or were based on fabricated evidence. Specifically, the prosecutor argued that Bins had not seen a photograph of defendant in August 2010, and that Bins did not identify anyone until December 17th, when she viewed the second set of photographs. The prosecutor also "made up the fact" that the defense chose not to subpoena Detective Law for trial.

¶ 71    Prosecutors are afforded wide latitude in making closing arguments. *Jones*, 2016 IL App (1st) 141008, ¶ 21. In making a closing argument, a prosecutor is permitted to comment on the evidence and any fair, reasonable inferences it yields, even if the suggested inference reflects negatively on the defendant. *People v. Jackson*, 2020 IL 124112, ¶ 82.

¶ 72    Bins testified that she did not identify anyone until she viewed the set of photographs on December 17, 2010. She also stated that she did not see defendant's photograph in the group she viewed in August 2010. Although Bins' testimony arguably contradicted the stipulation, which stated that Bins identified Wroten as the possible offender in August 2010 but was uncertain, it was the jury's responsibility to evaluate the credibility of her testimony. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). The prosecutor's remarks, based on Bins' testimony, were proper.

¶ 73    The remark that the defense chose not to subpoena Detective Law, however, was not based on the evidence or any reasonable inference therefrom. Defense counsel had subpoenaed Detective Law, who did not answer the subpoena. We recognize that the prosecutor made this comment in rebuttal, after defense counsel argued that "We don't get to hear from Detective Law." While the prosecutor may respond to defense counsel arguments which clearly invite a response, he or she must refrain from making improper comments. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993).

¶ 74    The prosecutor's comment, although improper, was not reversible error unless it constituted a material factor in defendant's conviction or caused substantial prejudice against him. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). Here, Bins positively identified defendant in a photograph array, in a line-up and in court as the offender. Defendant gave a statement to Detective Stover in which he confessed to the crime, and defendant's DNA was found inside the Hyundai. Bins did not give defendant permission to drive her vehicle. In light of this evidence, we find that the improper comment did not contribute to defendant's conviction. The trial court also instructed the jury that closing arguments are not evidence and they should disregard arguments not based on the evidence. This instruction cured any prejudice that may have resulted from the comment. *People v. Simms*, 192 Ill. 2d 348, 396 (2000).

¶ 75    Because we are not persuaded by defendant's claims of error, we need not consider whether they cumulatively led to prejudice. See *People v. Perry*, 224 Ill.2d 312, 356 (2007) (finding that cumulative error analysis was unnecessary where the court rejected each of the defendant's claims).

¶ 76    Defendant's final contention is that the trial court erred in refusing to instruct the jury on the lesser offense of criminal trespass to a vehicle. We review the trial court's ruling for abuse of discretion. *People v. Garcia*, 188 Ill. 2d 265, 283 (1999).

¶ 77    Although a defendant generally may not be convicted of an offense which has not been charged, in some cases a jury instruction on a less serious, uncharged offense is appropriate. *People v. Ceja*, 204 Ill. 2d 332, 359 (2003). A lesser-included offense "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2-9(a) (West 2014).

¶ 78    Courts utilize the charging instrument approach to determine whether a particular offense is included in a charged offense. *Ceja*, 204 Ill. 2d at 360. "First, a court must determine whether the charging instrument describes the lesser offense. At a minimum, the instrument charging the greater offense must contain a broad foundation or main outline of the lesser offense." *Id.* Second, even if the charging instrument identifies a lesser-included offense, a court must examine the evidence presented and determine whether the jury could rationally find the accused guilty of the lesser offense but acquit them of the greater offense. *Id.*

¶ 79    Under the facts of this case, the charging instrument did not describe the lesser offense of criminal trespass to a vehicle. Defendant was charged by indictment with committing the offense of aggravated vehicular hijacking "on or about July 22, 2010," in that he "knowingly took a motor vehicle, from the person or the immediate presence of Sharon Bins, by the use of force or by

threatening the imminent use of force, and he carried on or about his person, or was otherwise armed with a firearm." The taking of Bins' vehicle, in her presence and with use of a firearm, was a distinct offense that defendant completed when he grabbed Bins' keys and drove her vehicle from the hospital on July 22, 2010. Defendant's operation of Bins' vehicle without permission two days later near 95th Street, the evidentiary basis of his lesser-included offense argument, constituted an entirely different offense. As the trial court noted, "in this situation criminal trespass to a vehicle is a separate offense all together, not a lesser included offense of aggravated vehicular hijacking ***."

¶ 80    We disagree with defendant that the indictment's reference to the offense occurring "on or about July 22, 2010" necessarily encompassed the separate events of July 24, 2010. The charging instrument provided "a closed set of facts" identifying the specific offense for which the defendant was being charged. See *People v. Kolton*, 219 Ill. 2d 353, 361 (2006). The circumstances of July 24th involved separate conduct and a completely distinct set of facts. We also disagree that defendant had the right to have the court instruct the jury on his theory of the case, even though the State did not charge him with criminal trespass to a vehicle. "[A] trial court need not allow a defendant's request to have the jury instructed on offenses that are less serious, but not included, offenses *** regardless of whether the evidence at trial could support the less serious offense." *People v. Davis*, 213 Ill. 2d 459, 479 (2004). The trial court did not abuse its discretion in refusing to instruct the jury on the offense of criminal trespass to a vehicle.

¶ 81                                     III. CONCLUSION

¶ 82    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 83    Affirmed.